423 S.E.2d 547

**Sara W. SLACK, Plaintiff Below, Appellant,**

v.

**KANAWHA COUNTY HOUSING AND REDEVELOPMENT AUTHORITY, a Corporation; Frank Vinson; Carl Smith; James Schwartz, Defendants Below,**

Kanawha County Housing and Redevelopment Authority, a Corporation; Frank Vinson; Carl Smith, Appellees.

No. 20725

Supreme Court of Appeals of West Virginia.

Submitted June 2, 1992.

Decided July 9, 1992.

P. Rodney Jackson, Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for appellant.

Daniel R. Schuda, Steptoe & Johnson, Charleston, for appellee Kanawha County Housing and Redevelopment Authority.

David P. Cleek, Cleek, Pullin & Bibb, Charleston, for appellee Frank Vinson.

MILLER, Justice:

This is an appeal[1] from a final judgment of the Circuit Court of Kanawha County in a civil action brought by the plaintiff below, Sara W. Slack, involving claims of invasion of privacy, retaliatory discharge, and civil conspiracy. The plaintiff asserts that the trial court erred in setting aside the $60,000 jury verdict in her favor and in entering judgment notwithstanding the verdict in favor of defendant Frank Vinson on the invasion of privacy claim. She also contends that the trial court erred in not granting her a new trial on the retaliatory discharge and conspiracy claims. For the reasons hereinafter set forth, we reinstate the $60,000 verdict on the invasion of privacy claim and award the plaintiff a new trial on the retaliatory discharge and civil conspiracy claims.

## I.

Plaintiff began working for the Kanawha County Housing and Redevelopment Authority (the Authority) in August of 1983. The Authority is a public corporation set up as a conduit for federal funds to be used to provide safe, clean housing to persons who qualify under guidelines of the federal Department of Housing and Urban Development (HUD). In April of 1984, the plaintiff was made the manager of a program, known as the Section 8 Program, designed to provide for the rehabilitation of existing housing for rental by low-income persons. During this period, defendant Frank Vinson was the Executive Director of the Authority.

In the summer of 1985, the plaintiff became aware that Mr. Vinson owned an interest in a private company which managed certain properties which were subsidized by Authority funds. When the plaintiff confronted Mr. Vinson with this information and expressed concern about a possible conflict of interest, she was told to mind her own business. The plaintiff also expressed her concerns to several members of the Authority's board of directors. As a result of information supplied by the plaintiff, the Authority fired Mr. Vinson on November 4, 1985. The plaintiff was named Interim Executive Director of the Authority. The plaintiff subsequently approached the United States Attorney's office, and, as a result, Mr. Vinson was indicted on criminal charges in federal district court.

Shortly before Mr. Vinson was fired, the plaintiff became suspicious that other persons were overhearing conversations which took place in her office behind closed doors. Over the next several months, the plaintiff confided to several of the Authority's board members that she felt "the walls had ears" and asked to have her office "swept" for electronic listening devices. The plain-

---

**1.** Chief Justice McHugh and Justice Workman deemed themselves disqualified from participating in this case. The Honorable Fred H. Caplan and the Honorable J. Zane Summerfield were appointed as substitute justices to hear and decide this appeal.

tiff was told that she was being "paranoid," and her request was refused.

In September of 1986, the plaintiff returned to her duties as Section 8 Program Manager. In August of 1987, she took a month of sick leave. While the plaintiff was on leave, Mike Edds was appointed Executive Director of the Authority. Just before the plaintiff was to return to work, she was advised by Mr. Edds that she was being transferred to the position of Public Housing Manager. The plaintiff returned to work on September 1 or 2, 1987. Sometime thereafter, the plaintiff advised Mr. Edds of her displeasure with the transfer and asked to be allowed to express her concerns to the board of directors. Mr. Edds refused to allow the plaintiff to appear before the board, but advised them of her concerns at a board meeting on September 17, 1987. After the board meeting, Mr. Edds advised the plaintiff that the board of directors had approved the transfer. On September 18, 1987, the plaintiff tendered her letter of resignation.

In 1989, federal investigators discovered a listening device, still operational, concealed in the ceiling of the plaintiff's office. At his trial in federal court, Mr. Vinson subsequently testified that he had placed the device there in late October of 1985. Mr. Vinson further testified that he had recruited one of the janitors in the building to bring him the trash from the plaintiff's office every evening.

On September 15, 1989, the plaintiff instituted a civil suit against the Authority, Mr. Vinson, and others for invasion of privacy, civil conspiracy, and retaliatory discharge based on her claim that her transfer was a result of her "whistleblower" activities.[2] Trial commenced before a jury in the Circuit Court of Kanawha County on January 29, 1991. On February 11, 1991, the jury returned a verdict in favor of the plaintiff and against Mr. Vinson on the invasion of privacy claim and awarded the plaintiff damages in the amount of $60,000. The jury found for the defendants on the retaliatory discharge and civil conspiracy claims.

By order dated April 25, 1991, the trial court denied the plaintiff's motion for a new trial. The court subsequently, in an order dated June 26, 1991, set aside the verdict on the invasion of privacy claim on the ground that the statute of limitations had lapsed. The court also entered judgment notwithstanding the verdict in favor of Mr. Vinson with respect to half of the damage award on the ground of insufficient evidence. It is from these rulings that the plaintiff now appeals.

## II.

### INVASION OF PRIVACY

#### A.

The plaintiff's first assignment of error concerns the trial court's ruling on the statute of limitations in the invasion of privacy claim.[3] At trial, the court submitted to the jury, over the plaintiff's objection, a special interrogatory asking them to determine when the plaintiff knew or reasonably should have known that a listening device was present in her office.[4] The jury an-

2. The complaint also charged that local HUD officials Carl Smith and James Schwartz were parties to the civil conspiracy. Mr. Schwartz died prior to trial and was dismissed from the action by the agreement of the plaintiff. The trial court subsequently directed a verdict in favor of Mr. Smith on the ground that as a federal official he was entitled to qualified immunity for his discretionary acts.

3. We first acknowledged an action for invasion of privacy in Roach v. Harper, 143 W.Va. 869, 105 S.E.2d 564 (1958). In Syllabus Point 8 of Crump v. Beckley Newspapers, Inc., 173 W.Va. 699, 320 S.E.2d 70 (1983), we recognized four types of invasion of privacy claims:

"An 'invasion of privacy' includes (1) an unreasonable intrusion upon the seclusion of another; (2) an appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public."
This case, like Roach, involves eavesdropping, which falls within the first category.

4. Attached to the verdict form was the following special interrogatory: "Please state the date, month, day and year upon which you find by a preponderance of evidence that plaintiff, Sara Slack, knew or reasonably should have known that her workplace had a listening device pres-

swered "Early Nov. 1985." In reliance on this response, the circuit court ruled that the plaintiff's claim for invasion of privacy was barred by the statute of limitations and set aside the verdict.

■ The applicable statute of limitations is determined by reference to W.Va.Code, 55–2–12 (1959), which provides, in pertinent part:

"Every personal action for which no limitation is otherwise prescribed shall be brought: ... (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative."

In *Snodgrass v. Sisson's Mobile Homes Sales, Inc.*, 161 W.Va. 588, 244 S.E.2d 321 (1978), we recognized that this provision must be read *in pari materia* with W.Va. Code, 55–7–8a(a) (1959), which specifies that "[i]n addition to the causes of action which survive at common law, causes of action for injuries to property, real or personal, or injuries to the person and not resulting in death, or for deceit or fraud, also shall survive" the death of the injured party. *Accord Rodgers v. Corporation of Harpers Ferry*, 179 W.Va. 637, 371 S.E.2d 358 (1988); *Cavendish v. Moffitt*, 163 W.Va. 38, 253 S.E.2d 558 (1979). In *Snodgrass*, we stated:

"By isolating causes of action for fraud and deceit and combining them with personal actions which will survive under W.Va.Code, 55–7–8a(a), it is apparent that the Legislature intended to exclude from statutory survivability under subsection (a) other personal tort actions such as defamation, false arrest and imprisonment, and malicious prosecution. These latter personal actions, lacking statutory survivability and possessing no common law survivability, take a one-year statute of limitations under W.Va.

ent which may have given rise to a claim of

Code, 55–2–12(c)." 161 W.Va. at 594, 244 S.E.2d at 325.

It is generally recognized that in the absence of a statute to the contrary, invasion of privacy is a personal action which dies with the individual. *See, e.g., Maritote v. Desilu Prods., Inc.*, 345 F.2d 418 (7th Cir.), *cert. denied*, 382 U.S. 883, 86 S.Ct. 176, 15 L.Ed.2d 124 (1965); *Gruschus v. Curtis Publishing Co.*, 342 F.2d 775 (10th Cir.1965); *New Era Publications Int'l v. Henry Holt & Co.*, 695 F.Supp. 1493 (S.D.N.Y.1988), *aff'd*, 873 F.2d 576 (2d Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990); *Loft v. Fuller*, 408 So.2d 619 (Fla.App.1981), *review denied*, 419 So.2d 1198 (Fla.1982); *Fry v. Ionia Sentinel–Standard*, 101 Mich. App. 725, 300 N.W.2d 687 (1980); *Fasching v. Kallinger*, 211 N.J.Super. 26, 510 A.2d 694 (1986); *Bartholomew v. Workman*, 197 Okla. 267, 169 P.2d 1012 (1946); *Moore v. Charles B. Pierce Film Enters.*, 589 S.W.2d 489 (Tex.Civ.App.1979). *See generally Restatement (Second) of Torts* § 652I, comments a and b (1977). Thus, invasion of privacy is a personal action that does not survive the death of the individual at common law or under W.Va.Code, 55–7–8a(a). Consequently, a claim for invasion of privacy is governed by the one-year statute of limitations provided by W.Va.Code, 55–2–12(c). *See Christman v. American Cyanamid Co.*, 578 F.Supp. 63 (N.D.W.Va.1983).

### B.

The question, then, is whether the plaintiff's lawsuit was filed within one year of the date upon which her cause of action accrued. The general rule in tort actions was stated in Syllabus Point 1 of *Jones v. Trustees of Bethany College*, 177 W.Va. 168, 351 S.E.2d 183 (1986):

"The statute of limitations ordinarily begins to run when the right to bring an action for personal injuries accrues which is when the injury is inflicted."

*Accord Sattler v. Bailey*, 184 W.Va. 212, 400 S.E.2d 220 (1990); *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967). We have, however, also recognized excep-

invasion of privacy."

tions to this rule. In *Basham v. General Shale*, 180 W.Va. 526, 531, 377 S.E.2d 830, 835 (1988), we stated: "The discovery rule is an exception to the statute of limitations which delays the running of the statute until such time as the plaintiff knew, or reasonably should have known, of the injury and its cause." *Accord Shirkey v. Mackey*, 184 W.Va. 157, 159, 399 S.E.2d 868, 870 (1990). We have applied the discovery rule in a variety of tort cases. *E.g., Hickman v. Grover*, 178 W.Va. 249, 358 S.E.2d 810 (1987) (products liability); *Harrison v. Seltzer*, 165 W.Va. 366, 268 S.E.2d 312 (1980) (medical malpractice); *Family Sav. & Loan, Inc. v. Ciccarello*, 157 W.Va. 983, 207 S.E.2d 157 (1974), *overruled on other grounds Hall v. Nichols*, 184 W.Va. 466, 400 S.E.2d 901 (1990) (legal malpractice); *Morgan v. Grace Hosp., Inc.*, 149 W.Va. 783, 144 S.E.2d 156 (1965) (medical malpractice).

■ It is generally recognized that the discovery rule is applicable to a plaintiff's claim for the tort of invasion of privacy. *See Diliberti v. United States*, 817 F.2d 1259 (7th Cir.1987); *Montalti v. Catanzariti*, 191 Cal.App.3d 96, 236 Cal.Rptr. 231 (1987); *Cain v. State Farm Mut. Auto. Ins. Co.*, 62 Cal.App.3d 310, 132 Cal.Rptr. 860 (1976); *Arent v. Hatch*, 133 Mich.App. 700, 349 N.W.2d 536 (1984). *See generally* 62A Am.Jur.2d *Privacy* § 177 (1990); Annot., 57 A.L.R.4th 244 (1987). This rule is consistent with our tort law, and we adopt it.

The plaintiff's action for invasion of privacy was filed in September of 1989. The plaintiff asserts that she did not have sufficient information to bring such an action until earlier that year when she learned of Mr. Vinson's public admissions that he was responsible for placing a listening device in her office. Consequently, the plaintiff argues that her action was filed within the proper statutory period. The defendants, on the other hand, assert that the issue was properly submitted to the jury, which

determined that the plaintiff discovered or should have discovered the invasion of her privacy almost four years before suit was filed. Accordingly, the defendants urge us to affirm the circuit court's ruling.

■ In *Hickman v. Grover, supra*, we noted that the purpose of the discovery rule is to remedy the unjust and unreasonable effects of strict application of the statute of limitations in cases where the plaintiff is unaware of his injury until the statutory period has expired: "Justice is not done when an injured person loses his right to sue before he discovers if he was injured *or who to sue.*" 178 W.Va. at 252, 358 S.E.2d at 813. (Emphasis added). We then set out in Syllabus Point 1 what knowledge the plaintiff must have to have "discovered" his cause of action in products liability cases:

> "In products liability cases, the statute of limitations begins to run when the plaintiff knows, or by the exercise of reasonable diligence should know, (1) that he has been injured, (2) *the identity of the maker of the product,* and (3) that the product had a causal relation to his injury." (Emphasis added).

We recognized that "[t]his rule ... will allow the plaintiffs a fair chance to sue, while upholding the purposes behind the statute of limitations."[5] 178 W.Va. at 252, 358 S.E.2d at 813.

Although *Hickman* was a products liability case, the principle that the statute of limitations does not begin to run until the plaintiff knew or reasonably should have known of the identity of the person who inflicted the injury has been applied in other circumstances as well. In *Spitler v. Dean*, 148 Wis.2d 630, 436 N.W.2d 308 (1989), for example, the plaintiff's suit for an intentional tort was held not to be barred by the two-year statute of limitations on such claims where the plaintiff did not discover the identity of the person who struck him until almost two years after the

---

5. In *Morgan v. Grace Hospital, Inc.*, 149 W.Va. at 791, 144 S.E.2d at 161, we stated these purposes: "The basic purpose of statutes of limitations is to encourage promptness in instituting actions; to suppress stale demands or fraudulent claims; and to avoid inconvenience which may result from delay in asserting rights or claims when it is practicable to assert them." (Citations omitted).

alleged assault. In *Spitler*, the Wisconsin court stated:

"The public policy justifying the accrual of a cause of action upon the discovery of the injury and its cause applies equally to the discovery of the identity of the defendant in this case. We have consistently recognized the injustice of commencing the statute of limitations before a claimant is aware of all the elements of an enforceable claim.... A statute of limitations barring relief to victims before the defendant is, or could be, discovered violates this guarantee of fairness. We therefore conclude that Spitler's cause of action did not accrue until Spitler knew the identity of the defendant, or in the exercise of reasonable diligence, should have discovered the identity of the defendant.

"This conclusion is in keeping with the equitable principle underlying the statute of limitations, which is to allow plaintiffs their day in court, but also to protect defendants from having to deal with claims which defense against may be seriously impaired by stale or lost evidence. The issue presents a question of balancing the plaintiff's right to seek redress against the duration of the defendant's exposure to liability and the possible prejudices due to delay. Both are concerns of justice. Here, the balance remains in the plaintiff's favor." 148 Wis.2d at 636, 436 N.W.2d at 310–11. (Citations omitted).

In *Scutieri v. Estate of Revitz*, 683 F.Supp. 795 (S.D.Fla.1988), this principle was applied in an action for civil rights violations under 42 U.S.C. § 1983 which was premised on an illegal wiretap of the plaintiffs' residence. *See also Royal Indem. Co. v. Petrozzino*, 598 F.2d 816 (3d Cir.1979) (applying New Jersey law); *Lavellee v. Listi*, 611 F.2d 1129 (5th Cir.1980); *Mullinax v. McElhenney*, 817 F.2d 711 (11th Cir.1987); *McClendon v. State*, 357 So.2d 1218 (La. App.1978); *Meyers v. Larreategui*, 31 Ohio App.3d 161, 31 O.B.R. 326, 509 N.E.2d 971 (1986); *Adams v. Oregon State Police*, 289 Or. 233, 611 P.2d 1153 (1980).

This aspect of the discovery rule carries with it the requirement that the plaintiff must use due diligence to discover the identity of the person responsible for his or her injury. As the Wisconsin court stated in *Spitler v. Dean*, 148 Wis.2d at 638, 436 N.W.2d at 311: "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." (Citations omitted). We conclude, therefore, that in actions where the discovery rule applies, the statute of limitations does not begin to run until the plaintiff knows, or by the exercise of reasonable diligence should know, that he has been injured and the identity of the person or persons responsible.

■ Clearly, the special interrogatory submitted by the trial court in this case did not require the jury to determine when the plaintiff knew or should have known who was responsible for the invasion of her privacy. Accordingly, the circuit court clearly erred in setting aside the verdict on the invasion of privacy claim in reliance on the jury's response to the special interrogatory.

Looking at the record in this case, we note that there is no evidence that the plaintiff knew, or by the exercise of reasonable diligence should have known, who placed the listening device in her office until Mr. Vinson admitted responsibility in 1989. The evidence does show that the plaintiff knew Mr. Vinson was aware of private conversations conducted in her office. It also appears, however, that other people exhibited knowledge of her private conversations. Moreover, the plaintiff's uncontradicted testimony shows that she had reason to believe her conversations were being overheard long after Mr. Vinson had been fired.

The evidence also shows that the listening device was concealed in the plaintiff's office and could not have been discovered by a reasonable visual inspection. The plaintiff reported her suspicions to her superiors and requested that her office be searched for listening devices, but she was not believed, and her request for a search,

an action which might have led to discovery of the person responsible for placing the device in her office, was denied. We fail to see what other reasonable steps the plaintiff could have taken to discover the identity of the person who was invading her privacy.

In these circumstances, we conclude as a matter of law that the statute of limitations did not begin to run until the plaintiff learned that Mr. Vinson had admitted concealing the listening device in her office. Because the plaintiff's action was filed within one year of that date, we conclude that the circuit court erred in setting aside the jury's verdict on the invasion of privacy claim on the ground that the statute of limitations had expired.

### C.

The plaintiff also contends that the circuit court erred in granting Mr. Vinson judgment notwithstanding the verdict as to half of the $60,000 verdict on the invasion of privacy claim. The court eliminated the jury's award to the plaintiff of $12,000 for emotional distress and $18,000 for mental anxiety [6] on the ground that the evidence of such damages consisted solely of the plaintiff's testimony, uncorroborated by any medical or expert testimony.

The circuit court relied on *Nekolny v. Painter*, 653 F.2d 1164 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982), in which three former municipal employees brought suit for federal civil rights violations, alleging that they were fired from their jobs for political reasons. The court in *Nekolny* recognized that damages for mental and emotional distress could be recovered in such actions, but noted that limited evidence of injury had been presented in the case. One plaintiff stated that he was "very depressed" on learning he had been fired. The second plaintiff testified that at one point after being fired she was "a little despondent and [lacking] motivation." The third plain-

tiff explained that he did not look for other work because "I didn't work for six weeks, I was completely humiliated, and I stayed close to home."

In discussing the sufficiency of this evidence, the Court of Appeals noted the standard for proof of damages of mental anguish or emotional distress set out in note 20 of *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252, 265 (1978):

> " 'Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury.' " 653 F.2d at 1172.

The Court of Appeals went on to state in *Nekolny:*

> "A single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' (the latter in the context of explaining why other employment was not sought), is not enough to establish injury even when the statement is considered along with the facts of this case." 653 F.2d at 1172–73.

The import of *Nekolny* is that isolated and conclusory statements by the plaintiff as to his or her emotional state are not sufficient to prove emotional and mental distress damages. Nowhere in that opinion does the court state that recovery for such injuries can never be predicated on the uncorroborated testimony of the plaintiff. Indeed, in *Rakovich v. Wade*, 819 F.2d 1393 (7th Cir.1987), *vacated on other grounds*, 850 F.2d 1180 (7th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988), the court expressly stated that *Nekolny* was not to be read for the proposition

> "that an injured person's testimony, standing alone, will never be sufficient to establish damages. *See Crawford v.*

---

**6.** The verdict form was submitted by the defendants and listed a number of categories of damages. We find this form to be improper because it required the jury to set a dollar amount on a variety of separate items, all relating to the plaintiff's claim of emotional distress, some of which appear to be redundant. However, because the defendants urged the trial court to use this form, we decline to discuss the redundancy question.

*Garnier*, 719 F.2d 1317, 1324 (7th Cir. 1983). Rather, under *Nekolny*, where the injured party provides the sole evidence, he must reasonably and sufficiently explain the circumstances of his injury and not resort to mere conclusory statements." 819 F.2d at 1399 n. 6.

*See Biggs v. Village of Dupo*, 892 F.2d 1298 (7th Cir.1990). Moreover, a number of cases since *Nekolny* have allowed recovery for emotional or mental distress based solely on the plaintiff's uncorroborated testimony. *E.g., Crawford v. Garnier*, 719 F.2d 1317 (7th Cir.1983); *Chalmers v. City of Los Angeles*, 762 F.2d 753 (9th Cir.1985); *Mutafis v. Erie Ins. Exch.*, 561 F.Supp. 192 (N.D.W.Va.1983), *aff'd*, 775 F.2d 593 (4th Cir.1985); *Jacobs v. Meister*, 108 N.M. 488, 775 P.2d 254 (App.), *cert. denied*, 108 N.M. 582, 775 P.2d 1299 (1989); *Chomicki v. Wittekind*, 128 Wis.2d 188, 381 N.W.2d 561 (1985).

We have not required plaintiffs who have suffered emotional distress damages to buttress such claims by corroborative evidence at the peril of having their claims dismissed as a matter of law. We, therefore, conclude that the circuit court erred in entering judgment notwithstanding the verdict in favor of Mr. Vinson on the plaintiff's invasion of privacy claim.[7] On remand, the verdict will be reinstated.

**7.** In view of our holding, we need not discuss the plaintiff's claim that the court erroneously excluded the testimony of several corroborative witnesses because their statements were too general and conclusory.

**8.** We have used the term "retaliatory discharge" as a shorthand term for an employee discharge that contravenes some substantial public policy principle, as stated in the Syllabus of *Harless:*

"The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge."

*See also Collins v. Elkay Mining Co.*, 179 W.Va. 549, 371 S.E.2d 46 (1988); *Davis v. Kitt Energy Corp.*, 179 W.Va. 37, 365 S.E.2d 82 (1987); *Wiggins v. Eastern Assoc. Coal Corp.*, 178 W.Va. 63, 357 S.E.2d 745 (1987).

**9.** Defendants' Instruction No. 22 stated, in pertinent part:

## III.

### CONSTRUCTIVE DISCHARGE

The plaintiff next contends that the trial court erred in instructing the jury on her constructive discharge claim, which was ancillary to her cause of action for a retaliatory discharge against the Authority. The retaliatory discharge cause of action was based on the plaintiff's assertions that her role in bringing to the attention of the federal prosecutors improprieties in the operation of the Authority promoted a substantial public policy and, thus, protected her against any retaliation by her employer under *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978).[8]

The plaintiff's constructive discharge theory rested on her claim that her employer, the Authority, in retaliation for her cooperation with the federal prosecutors, changed her job position making it more onerous and forcing her to quit. The error asserted on the constructive discharge theory is an erroneous jury instruction. Over the objection of the plaintiff, the judge instructed the jury that to recover, the plaintiff had to show that the Authority's actions were taken with the intent of forcing her to resign.[9] The plaintiff asserts

"In West Virginia, a constructive discharge is defined as an action by the employer that subjects the employee to intolerable working conditions, which forces the employee to quit his or her employment. The intolerability of working conditions is assessed by the standard of whether a reasonable person would have felt compelled to resign. *A further requirement of showing such a claim is that plaintiff must show the employer's action[s] were intended by the employer to force the employee to quit.* There is no requirement that an employer act in a fair dealing fashion with an employee.

"If you believe that plaintiff has failed to demonstrate that her working conditions were intolerable based upon a reasonable person standard *and that the employer, Kanawha County Housing and Redevelopment Authority, committed acts that were an effort to force her to quit her job,* then you may find that plaintiff quit her job voluntarily and find against her and award no damages on such claim." (Emphasis added).

that there is no requirement that she make such a subjective showing to prove constructive discharge.

■ The elements for proving a constructive discharge have been discussed in a number of federal cases relating to age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and in employment discrimination cases under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq.*[10] Typically, in these federal cases, the constructive discharge cause of action arises when the employee claims that because of age, race, sexual, or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment.

There appears to be no disagreement that one of the essential elements of any constructive discharge claim is that the adverse working conditions must be so intolerable that any reasonable employee would resign rather than endure such conditions. *See, e.g., Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559 (1st Cir.1986); *Pena v. Brattleboro Retreat,* 702 F.2d 322 (2d Cir. 1983); *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140 (5th Cir.1975); *Wheeler v. Southland Corp.,* 875 F.2d 1246 (6th Cir.1989); *Thompson v. McDonnell Douglas Corp.,* 552 F.2d 220 (8th Cir. 1977); *Satterwhite v. Smith,* 744 F.2d 1380 (9th Cir.1984); *Cockrell v. Boise Cascade Corp.,* 781 F.2d 173 (10th Cir.1986); *Buckley v. Hospital Corp. of Am., Inc.,* 758 F.2d 1525 (11th Cir.1985). *See generally* Annot., 93 A.L.R.Fed. 10 (1989) (constructive discharge in ADEA cases); Annot., 55 A.L.R.Fed. 418 (1981) (constructive discharge in Title VII cases); 45A Am.Jur.2d *Job Discrimination* § 898 (1986); I.M. Saxe, *Constructive Discharge Under the ADEA: An Argument for the Intent Standard,* 55 Fordham L.Rev. 963 (1987).

A typical recital of this principle is found in *Calhoun v. Acme Cleveland Corp.,* 798

F.2d at 561, where the court quoted from its earlier decision in *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977): " '[T]he trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " Proof of this element may be determinative of the case: If the working conditions are not found to be intolerable, then there is no need for the court to consider the constructive discharge claim any further. *See, e.g., Shealy v. Winston,* 929 F.2d 1009 (4th Cir.1991); *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61 (5th Cir.1980).

Where intolerable working conditions are shown, there is some disagreement as to whether the employee must show that the employer created or allowed the intolerable conditions with the specific intent to force the employee to leave. The Court of Appeals for the Fourth Circuit appears to have adopted the view that such a showing is required. In *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986), the court stated: "Our decisions require proof of the employer's specific intent to force an employee to leave. *J.P. Stevens & Co., Inc. v. NLRB,* 461 F.2d 490, 495 (4th Cir.1972)." *See also Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981).

This is not, however, the view of the majority of the federal Courts of Appeals and of state courts that have addressed the specific intent requirement in constructive discharge cases. *See, e.g., Calhoun v. Acme Cleveland Corp., supra; Pena v. Brattleboro Retreat, supra; Bourque v. Powell Elec. Mfg. Co., supra; Wheeler v. Southland Corp., supra; Held v. Gulf Oil Corp.,* 684 F.2d 427 (6th Cir.1982); *Satterwhite v. Smith, supra; Derr v. Gulf Oil Corp.,* 796 F.2d 340 (10th Cir.1986); *Civil Rights Div. of Ariz. Dept. of Law v. Vernick Plumbing & Heating Co.,* 132 Ariz.

---

**10.** It should be noted that the constructive discharge rule utilized by the federal courts had its genesis in labor law, as stated in *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 887 (3d Cir.

1984): "The constructive discharge doctrine was first developed under the National Labor Relations Act, and is in that branch of labor law well established." (Citations omitted).

84, 643 P.2d 1054 (App.1982); *Gantt v. Sentry Ins.*, 234 Cal.App.3d 612, 265 Cal. Rptr. 814 (1990), *aff'd*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992); *Brady v. Elixir Indus.*, 196 Cal.App.3d 1299, 242 Cal.Rptr. 324 (1988); *Boulder Valley Sch. Dist. R–2 v. Price*, 805 P.2d 1085 (Colo.1991); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095 (D.C.App.1986); *Brewington v. Department of Corrections*, 161 Ill.App.3d 54, 112 Ill.Dec. 447, 513 N.E.2d 1056 (1987), *appeal denied*, 118 Ill.2d 541, 117 Ill.Dec. 222, 520 N.E.2d 383 (1988); *Beye v. Bureau of Nat'l Affairs*, 59 Md.App. 642, 477 A.2d 1197, *cert. denied*, 301 Md. 639, 484 A.2d 274 (1984); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174 (Tex.App.1991); *Bulaich v. AT & T Info. Sys.*, 113 Wash.2d 254, 778 P.2d 1031 (1989).

In *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir.1984), the Court of Appeals for the Third Circuit expressed the majority view in this fashion:

"[N]o finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."

Reflective of the majority of state courts on this point is *Beye v. Bureau of National Affairs*, 59 Md.App. at 652, 477 A.2d at

1202, where the court, after recognizing the minority position, stated:

"In most of the decisions, however, and particularly in the cases arising under the civil rights laws, such express intent has not been regarded as necessary. It suffices if the employer's actions were deliberate or, in cases of harassment by supervisors or fellow employees, if the employer was aware of the situation and permitted it to continue.... Indeed, in some instances the employer may not wish a separation at all. *See, for example, Young v. Southwestern Savings and Loan Association,* [509 F.2d 140 (5th Cir.1975) ]." (Citations omitted).

■ We have not had occasion to address this aspect of constructive discharge. In *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990), we addressed generally the liability of an employer under our Human Rights Act for discriminatory acts of its employees and limited liability to those instances where the employer knew or should have known of the employee misconduct.[11] We have also recognized that an employee may "voluntarily" leave employment under certain circumstances and still be eligible for unemployment benefits under W.Va.Code, 21A–6–1, *et seq.*[12] *See Wolford v. Gatson*, 182 W.Va. 674, 391 S.E.2d 364 (1990); *Hunt v. Rutledge*, 177 W.Va. 523, 354 S.E.2d 619 (1987); *Brewster v. Rutledge*, 176 W.Va. 265, 342 S.E.2d 232 (1986); *Ross v. Rutledge*, 175 W.Va. 701, 338 S.E.2d 178 (1985); *Murray v. Rutledge*, 174 W.Va. 423, 327 S.E.2d 403 (1985).

11. In Syllabus Points 7 and 8 of *Paxton,* we stated:

"7. If a discriminatory act has been committed by an officer or a supervisory employee, an employer may be held liable without showing that the employer knew or reasonably should have known of the misconduct, except where the supervisory employee was acting outside the scope of his employment.

"8. An employer will not be liable for discriminatory acts of its employee unless he knew or reasonably should have known of the discriminatory acts and did nothing to correct them, or expressly or impliedly authorized or ratified them."

12. In Syllabus Points 1 and 2 of *Murray v. Rutledge,* 174 W.Va. 423, 327 S.E.2d 403 (1985), we stated:

"1. 'Customary working conditions not involving deceit or other wrongful conduct on the part of the employer are not a sufficient reason for an employee to leave his most recent work voluntarily....' Syl., *Amherst Coal Co. v. Hix,* 128 W.Va. 119, 35 S.E.2d 733 (1945).

"2. Misrepresentations concerning the terms of employment or substantial unilateral changes in the terms of employment furnish 'good cause involving fault on the part of the employer' which justify employee termination of employment and preclude disqualification from the receipt of unemployment compensation benefits."

However, the statutory standard applicable in unemployment compensation claims is more liberal in accordance with the beneficial purposes underlying unemployment security law and is not applicable in a constructive discharge case.[13]

This case does not involve a claim of age or civil rights discrimination, but, rather, a claim for retaliatory discharge, i.e., that the plaintiff was forced to resign because she had disclosed and cooperated with federal prosecutors in regard to alleged wrongdoing by Mr. Vinson and members of the Authority. Other jurisdictions have concluded that in similar types of employment claims, the doctrine of constructive discharge is applicable. *See, e.g., Gantt v. Sentry Ins., supra; Finstad v. Montana Power Co.*, 241 Mont. 10, 785 P.2d 1372 (1990); *Large v. Acme Eng'g & Mfg. Corp.*, 790 P.2d 1086 (Okla.1990).

■ Where a constructive discharge is claimed by an employee in a retaliatory discharge case, the employee must prove sufficient facts to establish the retaliatory discharge. In addition, the employee must prove that the intolerable conditions that caused the employee to quit were created by the employer and were related to those facts that gave rise to the retaliatory discharge.

■ With regard to the constructive discharge aspect of this case, we adopt the majority view that in order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

■ The defendants' jury instruction on constructive discharge erroneously re-

quired the plaintiff to establish that the Authority's actions[14] were taken with a specific intent to cause her to quit. We recently spoke to the question of instructional error in Syllabus Point 8 of *Kodym v. Frazier*, 186 W.Va. 221, 412 S.E.2d 219 (1991):

> " ' "An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." Point 2, syllabus, *Hollen v. Linger*, 151 W.Va. 255 [151 S.E.2d 330 (1966)].' Syllabus Point 5, *Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969)."

Here, we cannot say that the plaintiff was not prejudiced by this instructional error. The instruction injected a substantially higher degree of proof to show a constructive discharge than our law requires. Consequently, we conclude that the jury verdict in favor of the defendant Authority on the retaliatory discharge issue must be reversed.

## IV.

## OTHER ISSUES

There are a number of other issues raised by the plaintiff which we address only briefly.

### A.

■ First, the plaintiff assigns several errors in regard to her civil conspiracy claim. We note, however, that the only damages the plaintiff proved in this case were damages for emotional distress and mental anguish. This was true as to all of the causes of action asserted. The evidence presented by the plaintiff did not differentiate in time or degree between the emotional distress and mental anguish resulting from the civil conspiracy and that

---

**13.** As a consequence, we find no merit in the plaintiff's claim that the trial court erred in not directing a verdict in her favor based on the fact that she prevailed in her unemployment compensation claim. Where the issues litigated are not the same, collateral estoppel has no applicability. *See* Syllabus Point 2, *Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983).

**14.** Because Mr. Vinson ceased to be the plaintiff's superior almost two years before she left her employment, the constructive discharge claim cannot be pursued against him on remand.

**156**

resulting from the plaintiff's other causes of action. Consequently, we are controlled by Syllabus Point 7 of *Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982):

> "It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories."

As earlier noted, we are ordering reinstatement of the verdict for the plaintiff's emotional injuries due to the invasion of privacy. In view of the identicality of the damage claim asserted under the civil conspiracy theory, we decline to address whether, from a substantive standpoint, there was sufficient evidence to prove such a theory. On remand, the plaintiff is free to develop the claim for civil conspiracy, but unless the damages are separate and distinct from those already obtained on the invasion of privacy verdict, there can be no recovery under *Harless.* Consequently, we decline to address the plaintiff's assignments of error with regard to the conspiracy claim.

### B.

■ The plaintiff also contends that the trial court erred in refusing her punitive damages instructions on the ground that she had adduced no evidence as to the wealth of the defendants. We have recog-

nized that the wealth of a defendant is a relevant consideration for the jury in making a punitive damage award. *TXO Prod. Corp. v. Alliances Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992); *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991); *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982).[15] *See generally* 22 Am.Jur.2d *Damages* § 807 (1988); Annot., 87 A.L.R.4th 141 (1991). We have never, however, mandated that a plaintiff must introduce evidence of the wealth of the defendant in order to recover punitive damages. In some cases, the defendant may wish to demonstrate its meager financial status as a way of holding down a punitive damage award. The failure of the plaintiff to introduce such evidence, however, does not preclude a punitive damage award. Consequently, the trial court erred in refusing the plaintiff's punitive damages instruction on the ground that financial worth of the defendant must be shown to recover punitive damages.

### C.

■ The plaintiff next contends that the trial court erred in not allowing the jury to decide whether she was entitled to recover damages under W.Va.Code, 62–1D–12, which provides a statutory right of action for compensatory and punitive damages against one who intercepts an oral, wire, or electronic communication.[16] This statute did not take effect until June of 1987. *See* 1987 W.Va. Acts ch. 149. There was no evidence at trial that the listening device was in use on or after the effective date of the statute. Thus, the plaintiff has

---

15. In Syllabus Point 2 of *Wells v. Smith, supra,* we stated:

> "In assessing punitive damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances."

16. W.Va.Code, 62–1D–12, provides:

> "(a) Any person whose wire, oral or electronic communication is intercepted, disclosed, used or whose identity is disclosed in violation of this article shall have a civil cause

of action against any person who so intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and shall be entitled to recover from any such person or persons:
> "(1) Actual damages, but not less than one hundred dollars for each day of violation;
> "(2) Punitive damages, if found to be proper; and
> "(3) Reasonable attorney fees and reasonable costs of litigation incurred.
> "(b) A good faith reliance by a provider of electronic or wire communication services on a court order or legislative authorization constitutes a complete defense to any civil or criminal action brought under this article or any other law."

no cause of action based on the statute. *See White v. Gosiene,* 187 W.Va. 576, 420 S.E.2d 567 (1992).

### D.

■ The plaintiff also contends that the trial court erred in not allowing her to introduce evidence as to the quantity and quality of her involvement with the federal investigation of Mr. Vinson and others. The question arose after employees of the Authority testified that the plaintiff was not the only employee who cooperated with the federal authorities and suggested that in certain instances the plaintiff may, in fact, have hampered the investigation. The testimony, elicited by the defense, called into question whether the plaintiff's participation in the investigation was of such a nature as to warrant retaliation by her employer. In such circumstances, evidence of the value of the plaintiff's efforts in assisting the federal authorities was clearly relevant and admissible. *See* W.Va.R.Evid. 401, 402, 403.[17]

### V.

For the reasons stated above, we reverse the judgment of the Circuit Court of Kanawha County and remand the case to the trial court with directions to reinstate the verdict in favor of the plaintiff on the invasion of privacy claim and for a new trial on the constructive discharge and conspiracy claims, subject to the restrictions discussed in Section IV(A) of this opinion.

Reversed and remanded with instructions.

McHUGH, C.J., and WORKMAN, J., deeming themselves disqualified, did not participate in the consideration or decision of this case.

CAPLAN, J., and SUMMERFIELD, Judge, were appointed as substitute justices.

---

**17.** We decline to address the remainder of the plaintiff's assignments of error either on the grounds that they are plainly without merit or that discussion thereof is unnecessary in view of our disposition of this case.